Filed 11/8/22  In re E.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.M., A Person Coming Under the Juvenile Court Law. | |
| | D080609 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ13014B) |
| v. | |
| T.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed in part, conditionally reversed in part and remanded with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, Eliza Molk, Senior Deputy County Counsel, for Plaintiff and Respondent.

T.M. (Mother) appeals from the juvenile court's orders denying her Welfare and Institutions Code[1] section 388 petition and terminating parental rights to son E.M. (§ 366.26.) She contends the juvenile court abused its discretion by denying her section 388 petition because she had shown a sufficient change of circumstance and the request was in E.M.'s best interest. She also asserts the juvenile court erred in finding that the parental-benefit exception to adoption did not apply because she maintained consistent visitation and had a positive relationship with E.M. that benefited him. (§ 366.26, subd. (c)(1)(B)(i).) We reject these contentions.

We requested supplemental briefing from the parties whether the San Diego County Health and Human Services Agency (the Agency) complied with its initial inquiry duties under the federal Indian Child Welfare Act (ICWA, 25 U.S.C. § 1901 et seq.) and section 224.2. (Gov. Code, § 68081.) We have received and considered the parties' submissions. The Agency concedes it did not comply with its initial inquiry duty under ICWA but contends that the error is harmless. Applying the standard of prejudice set forth in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*), we conclude that the record reveals the existence of readily obtainable information from extended family members likely to bear meaningfully on whether E.M. is an Indian child. Accordingly, we find the error prejudicial, conditionally reverse the orders terminating parental rights, and remand the matter for further proceedings.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

*Family History*

Mother has been engaged in prostitution since age 17, with E.M.'s father, E.M., Sr. (Father), acting as her pimp. She began using marijuana at age 18 or 19 and used the substance on-and-off for many years. At age 19, Mother was placed on a section 5150 hold due to a bipolar episode. Mother started daily methamphetamine use in her early 20's. At age 20, Mother gave birth to her oldest child, daughter J.J. In 2013, when J.J. was approximately three months old, Mother came to the Agency's attention based on allegations J.J. had been exposed to domestic violence. In 2014, the Agency filed a dependency petition on J.J.'s behalf but the juvenile court dismissed the petition after it placed J.J. with her father, K.J. In 2015, the Agency filed another dependency petition on J.J.'s behalf. In 2016, the maternal grandparents adopted J.J. after the juvenile court terminated Mother's parental rights "due to little evidence of behavioral changes and lack of participation in services." The same year, Mother was arrested for burglary and prostitution. She also ended her daily methamphetamine use.

At some point, Mother and Father married. Mother gave birth to E.M. in 2017 and separated from Father in 2018 but the couple remains married. In early June 2019, Mother again came to the Agency's attention after her then-boyfriend, J.D., strangled her in E.M.'s presence. The social worker noted that Mother is homeless, suffers from untreated bipolar disorder, and self-medicates with marijuana and cocaine. Mother admitted to ongoing prostitution. The Agency "safety planned" E.M. in the maternal grandparents' home.

*Petition and Reunification Period*

In late July 2019, the Agency filed a petition and protective custody warrant on E.M.'s behalf. The juvenile court issued the warrant and authorized E.M.'s out-of-home detention that same day. The petition alleged Mother and her boyfriend engaged in a violent confrontation that included the boyfriend twisting Mother's arm, choking her, pushing her onto the bed and trying to take her phone. E.M. tried to push the boyfriend off Mother. Mother admitted prior methamphetamine use, current cocaine use, a bipolar disorder diagnosis, and admitted she was noncompliant with prescribed medication. At the detention hearing a few days later, the juvenile court appointed counsel for E.M. and both parents, found that ICWA did not apply, and detained E.M. with the maternal grandparents, who had previously adopted J.J.

In July 2019, Dependency Drug Court (DDC) accepted Mother and ordered her to remain clean and sober at all times. On August 9, 2019, Mother tested positive for cocaine and alcohol. On August 19, 2019, Mother tested positive for cocaine. In early September, Mother missed two DDC hearings. On October 16, 2019, the social worker texted Mother and asked her to drug test; however, Mother did not respond. At the contested jurisdictional and dispositional hearing in October 2019, the juvenile court removed E.M. from Mother and bypassed her reunification services under section 361.5, subdivisions (b)(10) and (11). It found placement with Father detrimental to E.M., ordered reunification services for Father, allowed the parents supervised visitation, and gave the social worker the discretion to allow unsupervised visitation.

E.M. underwent an autism evaluation and was found to be " 'at risk of Autism.' " In May 2020, E.M. returned to preschool after the COVID-19

closures under an individualized education program (IEP) with a qualifying disability of autism spectrum disorder. E.M. displays some behavioral and aggression issues at school and is addressing these challenges with an applied behavioral analysis (ABA) therapist.

At a combined contested six- and 12-month review hearing in early January 2021, the juvenile court continued Father's reunification services to the 18-month date, continued its order that the parents' visits be supervised, and appointed the maternal grandparents as the holders of E.M.'s developmental and educational rights. At the contested 18-month review hearing in early September 2021, the juvenile court terminated Father's reunification services, continued the parents' supervised visitation, and set a section 366.26 hearing on E.M.'s behalf.

*Post-Reunification Period*

On January 19, 2021, Mother began to participate in a drug treatment program. On June 23, 2021, Mother failed to drug test at her drug treatment facility. On August 4, 2021, she relapsed on cocaine after eight months of sobriety. Later that month, Mother self-reported attending a weekly domestic violence group. She had housing and completed a parenting course.

In her January 2022 section 366.26 report, the social worker stated that E.M. received occupational and speech therapy three hours a day, five days a week to address his diagnoses of speech/developmental delay and semantic pragmatic disorder, and concerns regarding his physical development such as walking on the balls of his feet and potty-training. E.M. also received two-hour ABA therapy sessions three times a week. Mother continued supervised visitation for two hours twice a week. E.M. appeared happy to see Mother at visits and sometimes seemed sad when visits

5

concluded but was easily redirected with toys or assurance he would speak to the Mother telephonically.

In late March 2022, Mother filed a 388 petition requesting that E.M. be returned to her care with transitional services or family maintenance services. The juvenile court found that Mother had made a prima facie showing on her section 388 petition and set an evidentiary hearing. The court also granted Mother's request for structured unsupervised visits. The four hour visits occurred in a public setting twice per week. The caregivers later indicated that since being granted unsupervised visits with Mother, E.M.'s inappropriate behaviors "escalated."

On June 2, 2022, the juvenile court held a combined contested hearing under sections 388 and 366.26. The court accepted the Agency's reports and attachments into evidence. At Mother's request, the juvenile court attached documents dated May 3, 2022, from Mother's respective domestic violence and drug treatment programs to her petition. The court heard testimony from Mother and the Agency social worker who has been assigned the matter since December 2021. The court then heard oral argument from all counsel on Mother's section 388 petition. The juvenile court concluded that Mother had not met her burden of proof because circumstances were changing but not yet changed, and it was not in E.M. best interests to be returned to Mother.

Due to time constraints, the court ended the hearing and reconvened later that month to hear argument on the contested section 366.26. After hearing argument, the juvenile court found E.M. to be specifically and generally adoptable. It concluded that the parental-benefit exception did not apply, terminated Mother and Father's parental rights, selected adoption as

E.M.'s permanent plan, and designated the maternal grandparents as E.M.'s prospective adoptive parents. Mother timely appealed.

DISCUSSION

## I. *NO ERROR IN DENIAL OF MODIFICATION PETITION*

### A. *General Legal Principles*

"Section 388 provides an ' "escape mechanism" ' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. [Citation.] This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency. [Citation.] After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

The petitioner has the burden of showing by a preponderance of the evidence a substantial chance in circumstance and that the proposed modification would be in the child's best interests. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "[A] section 388 petition seeking reinstatement of reunification services or return of the child will necessarily involve a parent who has made mistakes sufficient to support termination of services at some point in the past. The question must be whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interests." (*Id.* at p. 848.) "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between

7

termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*Id.* at p. 846.)

A modification petition is addressed to the juvenile court's sound discretion and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)

B. Analysis

The juvenile court commended Mother for her work in "getting [her]self into a substance abuse program, completing that program, being in aftercare, participating in the domestic violence program" and continuing with therapy but noted "that simply changing circumstance—circumstances that are in the process of changing and that are not simply changed is not enough to overcome the burden in this case." Regarding Mother's substance abuse, the court commented on her lengthy use period, that she has not yet reached a year of sobriety and wanted to see her sober for a longer time. It expressed concern that Mother had not yet completed her domestic violence program and the lack of evidence regarding Mother's insight into this issue, ability to protect the children and understand the affects that domestic violence has on a child. Finally, it found Mother's mental health concerns and current

8

housing to be a changing circumstances. The court also found Mother did not produce sufficient evidence establishing it was in E.M.'s best interests to change his placement.

Mother asserts that the plain language of section 388 requires she show a "change of circumstance" and she need not show that her circumstances have completely changed to meet the first prong of section 388. To modify or set aside a prior order in a dependency proceeding, the change of circumstance must be material (*In re N.F.* (2021) 68 Cal.App.5th 112, 120), and it must "relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.) Mother is correct that numerous cases draw a distinction between circumstances that are "changing" but not yet "changed." (See e.g., *Stephanie M.*, *supra*, 7 Cal.4th at p. 317 ["At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interest of the child. (§ 388; . . . .")]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["Appellant's recent sobriety reflects 'changing,' not changed, circumstances."].) The references to "changed" and merely "changing" circumstances are another way of distinguishing a "change in circumstance" that is not sufficiently material to warrant modifying a prior order when considering all the circumstances of the case. (*In re N.F.*, at p. 121, fn. 3.)

Here, Mother does not identify how the juvenile court erred in finding she did not show a material change of circumstance considering all the circumstances of the case. She merely restates the evidence she presented in support of her section 388 petition and argues that the evidence shows she "presented new evidence or a change of circumstance." Mother failed to meet

9

her burden on appeal to show the juvenile court erred. (*In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error.' "].)

E.M. came to the Agency's attention due to Mother's substance abuse, mental health issues, domestic violence, and a prior termination of parental rights due to domestic violence and substance abuse. As we shall explain, the juvenile court did not exceed the bounds of reason in concluding the record did not establish a sufficient change of circumstance to justify modification of its previous order.

The juvenile court acknowledged that Mother completed a drug treatment program but concluded the change to be insufficient given the length of her substance abuse history (nearly half her life) and relatively short period of sobriety (less than a year). Substance abuse is one of the most serious problems a parent can face and "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) Moreover, "[i]n the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.*, *supra*, 68 Cal.App.5th at p. 121.)

Here, Mother maintained her sobriety for six months while in a drug treatment program and then failed to drug test at her drug treatment facility. We found no explanation for why Mother failed to drug test and the missed test is " 'properly considered the equivalent of a positive test result[.]' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.) Then, less than two months after failing to test, Mother relapsed on cocaine due to

stress caused by the social worker's questions and concerns that she still engaged in prostitution. Even more concerning is the fact Mother had previously been able to maintain sobriety for three or four years before relapsing. Thus, while Mother's apparent sobriety is commendable, we cannot conclude that the juvenile court erred by finding the change insufficient to show she can remain sober outside a drug treatment program while caring for a special needs child full time.

E.M.'s dependency petition noted Mother's bipolar disorder diagnosis and her noncompliance with taking prescribed medication. Mother failed to address this issue in her opening brief and forfeited any claim of error. (See generally *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [failure to support a point with reasoned argument and citations to authority forfeits issue].) Even if not forfeited, the record does not show a material change of circumstance.

At age seven, Mother received a bipolar disorder diagnosis. While in school, Mother had an IEP for bipolar disorder, anxiety, and depression. At age 19, Mother was placed on a section 5150 hold due to a bipolar episode. In August 2019, Mother informed the social worker that she had been on medication all her life and her "psychiatrist prescribed her with the medications and she has been consistently taking them for a month." At the contested hearing, however, Mother stated that her psychiatrist prescribed her an anxiety medication but she "hardly ever take[s] it," uses it only when necessary and her "mental health illness [was] under control." Given Mother's nearly lifelong battle with bipolar disorder and the lack of evidence corroborating Mother's claim that her mental health illness was under control, the juvenile court did not act unreasonably when finding that Mother had not demonstrated a material change in circumstance.

11

Finally, the juvenile court expressed concern that Mother's domestic violence issues remained a changing circumstance, noting that Mother still had a fourth of her 52 sessions to complete and it had no information regarding Mother's insight into this issue or how domestic violence impacts a child. The record shows that in 2013, the Agency became involved with Mother due to domestic violence between her and J.J.'s father. Early in these dependency proceedings, Mother admitted that her relationship with Father included domestic violence. She claimed "it was not bad in the beginning as he was only controlling" but Father started hitting her when she was pregnant with E.M. and after she gave birth to E.M. Mother never reported these domestic violence incidents. The maternal grandmother confirmed that Mother had a history of domestic violence with Father. Yet, at the contested hearing, Mother denied a domestic violence relationship with Father based on her apparent conclusion that the domestic violence incidents between her and Father did not count because they were unreported.

The juvenile court could reasonably conclude from Mother's testimony that she failed to understand that unreported domestic violence is still domestic violence. This, combined with the lack of evidence showing Mother understood the serious effect domestic violence had on children, supported the juvenile court's implied conclusion that Mother had not demonstrated a material change in circumstance. (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5 ["[C]ommon sense and expert opinion indicate [domestic violence] is detrimental to children."].)

Based on Mother's failure to meet her burden of demonstrating the first prong of the test under section 388, we need not address the second prong addressing whether the proposed modification placing E.M. with Mother

12

would promote his best interests.  (*Stephanie M., supra,* 7 Cal.4th at p. 317.)[2]
We conclude the juvenile court did not abuse its discretion in denying
Mother's modification petition.

### II. *SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT THE BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION DID NOT APPLY*

A. *General Legal Principles*

The permanency planning hearing aims "to end the uncertainty of
foster care and allow the dependent child to form a long-lasting emotional
attachment to a permanent caretaker."  (*In re Emily L.* (1989) 212 Cal.App.3d
734, 742.)  The Legislature prefers adoption where possible.  (*In re L.Y.L.*
(2002) 101 Cal.App.4th 942, 947.)  Once the juvenile court finds a child is
adoptable, the parent bears the burden of proving one of the exceptions to
terminating parental rights exists.  (*In re Lorenzo C.* (1997) 54 Cal.App.4th
1330, 1343.)  "Because a section 366.26 hearing occurs only after the court
has repeatedly found the parent unable to meet the child's needs, it is only in
an extraordinary case that preservation of the parent's rights will prevail
over the Legislature's preference for adoptive placement."  (*In re Jasmine D.*
(2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground by *Caden
C., supra,* 11 Cal.5th at p. 636, fn. 5.)

One of the exceptions to the preference for adoption is the beneficial
parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  For this
exception to apply, the parent must show by a preponderance of the evidence:
(1) regular visitation and contact with the child; (2) the child has a
substantial, positive, emotional attachment to the parent; and (3)

---

[2]    Even if we were to discuss this element, we would find that placing
E.M. with Mother would not be in his best interests largely for the same
reasons discussed below.  (See, *post,* pt. II.B.)

13

terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).) The existence of this relationship is determined by taking into consideration "the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C.*, at p. 634.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.)

With regard to the court's conclusion that a parent did not meet his or her burden of proof regarding any factual findings, we look to "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647, disapproved on other ground by *Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6.) The question is "whether the . . . evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "[T]he ultimate

decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at p. 640.) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd decision.' " ' " (*Id.* at p. 641.)

B. *Analysis*

The juvenile court found E.M. to be generally and specifically adoptable. It agreed with the parties that Mother had regular visitation and contact with E.M. On whether E.M. had a substantial, positive emotional attachment to Mother, it focused on E.M. who has lived most of his life outside her presence. E.M did not ask for Mother outside of visits, did not display emotional distress following visits, and is easily redirected if he displays sadness after visits. The court noted that after it granted Mother structured unsupervised visits in the community, E.M.'s behavior regressed both at home and at his daycare. It agreed with the social worker's assessment that terminating Mother's parental rights would not be detrimental to E.M. and found the permanency and stability of adoption outweighed any harm E.M. would suffer from the termination of parental rights.

We agree that the evidence shows Mother regularly and consistently visited E.M. to the extent allowed by the court's orders. Turning to the second element, whether E.M. would benefit from continuing his relationship with Mother, we focus on the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) At this step of the analysis the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) We consider several factors in examining

15

whether a relationship is important and beneficial, including the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, at p. 632)

E.M. was almost two years old when the Agency removed him from Mother's care and placed him with his maternal grandparents (the caregivers). At the time of the contested hearing, E.M. had been out of Mother's care for nearly three years and has thus spent most of his young life outside Mother's care. When E.M. left Mother's care he was too young to have developed a strong emotional attachment to her or understand the concept of a biological Mother. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 466.) The record shows that E.M. loves Mother and enjoyed his supervised visits with her. The social worker noted, however, that E.M. associates "toys and treats" with his visits. Additionally, E.M. generally leaves visits without distress and does not ask for Mother between visits. When E.M. displays sadness at the end of a visit he is easily redirected.

When Mother's visitation changed to longer unsupervised visits in the community, Mother took E.M. to restaurants, the beach, parks, the movies, and amusement parks. During this time, E.M.'s behaviors regressed. His caregivers informed the social worker that E.M. had "long tantrums that last 20-30 minutes throughout the day" and that E.M. "kicks, pinches, hits and pushes both his caregivers when he does not get something he wants." E.M.'s daycare noticed the same pattern. The daycare asked for E.M. to be taken home "due to several incidences in which he dropped his pants and attempted to show other children his penis" and on another occasion for hitting one of his teachers. The social worker commented that the "progress [E.M.] initially

16

had a few months ago, has now declined back to his original emotional baseline and initial reasons why ABA services were implemented."[3]

The social worker noted that "[a]n important aspect of the parent child relationship is determined by a child's behavior after seeing their parents. In [E.M.'s] case, the increase in behavioral concerns occurred when the level of supervision changed from supervised to unsupervised, wherein [Mother] assumed greater parental responsibility during visits. It is evident that the lack in parental structure and ability to meet [E.M.'s] cues leads to a decline in behavior. For example, when considering [E.M.'s] specific needs, and his Autism diagnosis, structured visits are necessary for a special needs child. [E.M.] needs to know what is expected from him, where he is going, and to earn items which ultimately reinforce positive behaviors." Ultimately, this regression in E.M's behavior led the social worker to question the quality of the relationship between E.M. and Mother.

The social worker opined that a substantial positive emotional attachment did not exist between E.M. and Mother based on his reactions to Mother during visits. She explained that sometimes E.M. needed encouragement to visit Mother but other times, when he is excited based on where Mother would be taking him (such as to an amusement park or the movies), E.M. would be excited for the visit. The social worker also noted that after visits E.M. needed to be reminded to give Mother a hug or a goodbye kiss, and between visits E.M. did not ask about Mother.

---

[3] Mother notes that the juvenile court did not address whether E.M's negative behavior after unsupervised visits might be due to missing her and wanting to be with her. While Mother is correct that the juvenile court did not directly address this possibility, it impliedly found this was not the case because E.M.'s behavior regressed both at home and at his daycare.

Our review of the record shows substantial evidence upon which the juvenile court could reasonably rely to conclude that Mother's relationship with E.M., while positive and loving, did not show the existence of a significant emotional attachment between E.M. and Mother.

Assuming for the sake of argument that Mother established a beneficial relationship, we cannot find the court abused its discretion in ultimately concluding that the benefits E.M. would realize from adoption outweighed any harm or detriment he might suffer from the terminating Mother's parental rights.

Mother did not present any evidence that E.M. would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of this relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Instead, the social worker, who had a master's degree in social work and training in assessing a child's permanent plan, opined that terminating Mother's parental rights would not be detrimental to E.M.  The social worker testified that the benefits of adoption included "consistency, stability, nurturing, unconditional positive love and . . . having a safe place where he knows what to expect, continuing his individual services, which is important due to his diagnoses."  She opined that E.M. would be sad if he lost his twice weekly visits with Mother but that this sadness could be overcome with therapeutic services, and the support of his caregivers, and that E.M. would not suffer detriment if the court terminated parental rights.  "The court was entitled to find the social worker's opinion credible and give great weight to her assessment.  We cannot reweigh the evidence or substitute our judgment for that of the [juvenile] court."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.)

" 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  On this record, the juvenile court did not exceed the limits of legal discretion in determining that providing E.M. this commitment outweighed the benefit he would gain through maintaining his pleasant, positive relationship with Mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)  Accordingly, we find no evidence of exceptional circumstances requiring application of the parental-benefit exception to the termination of Mother's parental rights.

### III. *A REMAND IS REQUIRED FOR ICWA COMPLIANCE*

#### A. Additional Background

At the start of this dependency proceeding the social worker asked the parents whether they or any extended family member had any American Indian heritage, had received any benefits or services from a tribe, spoken any Indian language, or lived on a reservation.  The parents responded " 'no' " to each question.  Mother filed an ICWA-020 form noting that, to her knowledge, she had no Indian ancestry.  Father filed a paternity questionnaire and offer of proof and checked the box "no" to a question asking if he had any American Indian heritage.  At the July 2019 detention hearing, the juvenile court found ICWA did not apply based on the parents' denials.  Although the juvenile court did not address ICWA at the contested section 366.26 hearing, the court minutes for this hearing indicate the court found, without prejudice, that ICWA did not apply.

#### B. Analysis

ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to,

an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and their right to intervene. (25 U.S.C. § 1912(a); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8.) California law also requires such notice. (§ 224.3, subd. (a) ["If the court [or] a social worker . . . knows or has reason to know . . . that an Indian child is involved, notice pursuant to [ICWA] shall be provided for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement[.]"].)

Effective January 1, 2019, section 224.2 was enacted and section 224.3 amended, to set forth California's current ICWA inquiry and notice requirements for juvenile dependency cases. (Stats. 2018, ch. 833, §§ 5, 7.) In dependency proceedings, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

The Agency's initial inquiry duty includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).)[4]

We review a juvenile court's findings that the Agency has made reasonable inquiries regarding a child's possible Indian ancestry under ICWA and that the

---

[4]     ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew,

20

Agency has complied with ICWA's notice requirements, or that no such notice is required, for substantial evidence. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.) Here, the Agency concedes substantial evidence does not support the juvenile court's finding that the Agency complied with its ICWA inquiry obligations under section 224.2. The Agency's concession is proper.[5]

The Agency conducted a deficient initial ICWA inquiry because it failed to ask the maternal grandparents about the possibility of Indian ancestry, although the Agency had extensive contact with them as E.M.'s caregivers. The Agency also had addresses and telephone numbers for the paternal grandparents and a maternal aunt but nothing in the record suggests that the social worker never inquired of them whether they had any Indian ancestry. The Agency also sent letters to six relatives who, may or may not, qualify as extended family members under ICWA, notifying them of E.M.'s involvement in the dependency court process. A copy of this mailing is not in the record and it is unknown whether the mailing inquired about Indian Ancestry.

The parties dispute whether the conceded error was harmless. Until such time that the California Supreme Court directs otherwise, this division has adopted the approach articulated in *Benjamin M.*, *supra*, 70 Cal.App.5th 735.

---

first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

[5] As a preliminary matter, the parents' denial of Native American heritage at the beginning of the proceeding does not relieve the Agency of its "broad duty" to inquire of readily ascertainable extended family members whether E.M. is an Indian child. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) A contrary rule would "ignore[ ] the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*Ibid.*; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 680 [applying *Benjamin M.* standard and finding reversible initial inquiry error where agency "asked the parents about Indian ancestry" but "failed to ask extended family members about it"].)

(*In re Y.M.* (2022) 82 Cal.App.5th 901, 916.)  A reversal is appropriate where "the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, at p. 744.)

We disagree with the Agency's contention that the facts here are similar to those in *In re Y.M.*, *supra*, 82 Cal.App.5th 901.  In *In re Y.M.*, the mother and father denied Native American ancestry but father lived with the paternal grandmother and uncle, the paternal grandfather visited the child, requested placement of the child and was participating in the resource family approval process.  (*Id.* at p. 917.)  Under these facts, another panel of this court held that the Agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry by not asking the paternal grandparents about possible Indian ancestry was harmless because Father lived with the paternal grandmother, they shared a good relationship, and he could have easily asked her about possible "Indian ancestry that may have afforded him additional rights or protection under ICWA." (*Ibid.*)  Additionally, the paternal grandfather had sought placement of the child and "presumably would have had a strong incentive to raise any Indian ancestry in support of that goal, but he did not do so." (*Id.* at pp. 917–918.)  Under these facts, we held that father failed to carry his burden to show that if the Agency had asked the paternal grandparents about any Indian ancestry, that they would have provided information that was likely to bear meaningfully on the question of whether there was reason to believe child was, or may be, an Indian child.  (*Ibid.*)

Here, unlike *In re Y.M.*, *supra*, 82 Cal.App.5th 901, there are two sets of grandparents.  The paternal grandparents lived in Texas and, although Father claimed they were part of his "strong support system," there is no information in

22

the record showing that the Agency ever spoke to the paternal grandparents to confirm this assertion. Father and the paternal grandmother had a single video call with E.M. in August 2019. Father represented in September 2019 that although he lived with the paternal grandmother, he was moving out and she did not want a home assessment to be done. In November 2020, Father told a social worker he lived with the paternal grandmother. When the social worker asked to use her telephone number to contact him, he claimed "it would be on for the week." Father received 18 months of reunification services and the court terminated his services in September 2021. As of January 2022, the Agency had lost contact with Father and the caregivers stated "that the last they heard from the paternal relatives was when the paternal grandmother sent Christmas gifts." There is no information in the record regarding Father's relationship with the paternal grandfather or whether the paternal grandfather ever contacted E.M.[6]

Unlike the facts in *In re Y.M.*, *supra*, 82 Cal.App.5th 901, Father did not seek placement of E.M. and there are no facts from which we can presume that Father had a strong incentive to question the paternal grandparents regarding any Indian ancestry. On this record, there are no unique circumstances from which we can presume that the paternal grandparents would not have had information likely to bear meaningfully on E.M.'s possible Native American ancestry. Based on this deficiency, substantial evidence does not support the

---

[6] The court minutes for the continued section 366.26 hearing in March 2022 reflect that the *paternal* grandparents appeared telephonically. This appears to be a mistake. In the reporter's transcript for this hearing the court officer announced the individuals present as including "paternal grandparents, Sharon and Chris, are on the phone. . . ." The court officer misspoke because Sharon and Chris are the first names of the *maternal* grandparents.

juvenile court's finding that ICWA did not apply. Accordingly, we conditionally reverse the orders terminating parental rights and remand for the limited purpose of ICWA compliance.[7]

As an aside, the Agency notes that it filed a request for judicial notice in the juvenile court regarding the findings and orders in half-sibling J.J.'s case where the court found ICWA did not apply. J.J.'s case took place between 2015 and 2017, with parental rights terminated in 2016. Thus, the ICWA finding for J.J. occurred *before* the Legislature amended ICWA in 2019 to enact section 224.2 which requires inquiry of extended family members. The version of section 224.3 at that time did not require a due diligence finding or contain a "duty to inquire" by "asking . . . extended family members." (§ 224.2, subd. (b), compare former § 224.3.) Accordingly, it is unknown whether the Agency's ICWA inquiry in J.J.'s dependency proceeding comported with the standards required by the current ICWA statutes.

We find the Agency's error to be prejudicial, conditionally reverse the orders terminating parental rights, and remand the matter for further proceedings. Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

---

[7] Based on the Agency's failure of initial inquiry regarding the paternal grandparents, it is unnecessary for us to analyze the Agency's inquiry shortcomings regarding the maternal grandparents. Nonetheless, because the Agency has frequent contact with the maternal grandparents as E.M.'s caregivers, on remand the Agency must satisfy its statutory duty of initial inquiry for them and any other readily available extended maternal relatives.

## DISPOSITION

The order denying Mother's section 388 petition is affirmed. The orders terminating parental rights are conditionally reversed and the matter is remanded to the juvenile court with directions that, within 30 days of the remittitur, the Agency must file a report demonstrating its compliance with the initial inquiry provisions of section 224.2, subdivision (b), and, if required, conduct further inquiry under section 224.2, subdivision (e). Within 45 days of the remittitur, the juvenile court must conduct a hearing to determine whether the Agency's investigation satisfied its affirmative duty to investigate. The juvenile court has the discretion to adjust these time periods on a showing of good cause.

If neither the Agency nor the juvenile court has reason to believe or to know that E.M. is an Indian child, the orders terminating parental rights shall be reinstated by the juvenile court. Alternatively, if after completing the inquiry the Agency or the juvenile court has reason to believe that E.M. is an Indian child, the court shall proceed accordingly.

HUFFMAN, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.

25